[Cite as *State v. Hickman*, 2015-Ohio-4668.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| STATE OF OHIO | | C.A. No. 27321 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| KEITH L. HICKMAN | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. CR 2013 09 2555 |

DECISION AND JOURNAL ENTRY

Dated: November 12, 2015

CARR, Presiding Judge.

{¶1} Appellant, Keith Hickman, appeals the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} This matter arises out of a shooting that occurred in Akron, on March 8, 2013. On September 30, 2013, the Summit County Grand Jury indicted Hickman on one count of felonious assault with an attendant firearm specification. Hickman pleaded not guilty to the charge at arraignment. The matter proceeded to trial where Hickman was found guilty by a jury. The trial court imposed an eight-year term of incarceration on the count of felonious assault and a three-year term of incarceration on the firearm specification for a total prison sentence of eleven years.

{¶3}　On appeal, Hickman raises nine assignments of error.　We rearrange and combine certain assignments of error to facilitate review.

II.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED AS A MATTER OF LAW BECAUSE THE STATE FAILED TO ESTABLISH ON THE RECORD THAT THERE WAS SUFFICIENT EVIDENCE TO SUPPORT A CONVICTION OF FELONIOUS ASSAULT.

## ASSIGNMENT OF ERROR II

APPELLANT'S CONVICTION OF FELONIOUS ASSAULT WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE, AND THE JURY LOST ITS WAY WHEN IT FOUND THE APPELLANT GUILTY.

{¶4}　In his second and third assignments of error, Hickman argues that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. This Court disagrees.

{¶5}　Hickman was convicted of felonious assault as outlined in R.C. 2903.11(A)(1/2) which states, "No person shall knowingly * * * [c]ause serious physical harm to another * * * [or] [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."　R.C. 2923.11(A) defines "deadly weapon" as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."　Former R.C. 2901.22(B) stated, "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature.　A person has knowledge of circumstances when he is aware that such circumstances probably exist."

### Sufficiency of the Evidence

{¶6} In his third assignment of error, Hickman argues that the State failed to present sufficient evidence demonstrating that he shot the victim, Tobias Flakes. Hickman argues that Flakes was the only witness who testified to that effect at trial and that the State never presented any physical evidence that linked Hickman to the crime.

{¶7} A review of the sufficiency of the State's evidence and the manifest weight of the evidence adduced at trial are separate and legally distinct determinations. *State v. Gulley*, 9th Dist. Summit No. 19600, 2000 WL 277908, *1 (Mar. 15, 2000). When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id*. at paragraph two of the syllabus.

{¶8} Tobias Flakes testified as follows. Flakes worked for Hickman doing odd jobs at several of Hickman's properties. Flakes was suffering from a drug problem and Hickman paid him "normally in crack and cash, majority crack." Flakes further testified that Hickman was a drug dealer and he witnessed Hickman sell drugs. Around the beginning of March in 2013, Flakes and his girlfriend began renting a room in Hickman's house in Akron. Driven by his addiction, Flakes stole a gun from Hickman's house and sold the gun for drugs.

{¶9} On the evening of March 8, 2013, Hickman arrived at the house with several friends. Flakes and his girlfriend were in the living room. Hickman entered the house and said,

"Dude, T, where's my f****** gun?" Flakes panicked and suggested that the gun might be in the basement. Hickman grabbed Flakes and went to the basement to look for the gun. Once in the basement, Hickman looked at Flakes and said, "Why the f*** you lying? Where's my gun?" Flakes testified that, at that point, Hickman "exploded." Hickman picked up a broken cement brick and "bashed" Flakes in the head. Flakes again insisted that he did not have the gun. Hickman then grabbed Flakes under his arms and walked him up the stairs and out of the basement. Hickman took Flakes into the kitchen and pinned him in a corner. After reaching into his own pockets, Hickman called for his friends to "bring that gun in here." Hickman dragged Flakes into the living room and directed Flakes' girlfriend to open the front door. When she refused, Hickman pulled Flakes over to the door and opened it himself. Two men were standing outside and one of them handed Hickman a gun. Flakes was in tears as he pleaded, "Keith, please. I don't want to die." Hickman placed the gun up against Flakes' leg and again said, "Where['s] the f****** gun at?" Hickman then shot Flakes in his left leg. Flakes testified that the men said they needed to "go dump him somewhere." As the men escorted Flakes out of the house and down the steps, Flakes yelled for his girlfriend to leave and find help. Flakes' girlfriend then called 911 on her cell phone. Hickman and the two men then decided to abscond, leaving Flakes behind on the steps. Flakes testified that the men went back into the house briefly before driving away.

{¶10} When the paramedics arrived, Flakes told them he did not know who shot him. During his testimony, Flakes explained that he and Hickman had previously discussed "the G code," an understanding whereby drug dealers do not turn to law enforcement to settle their disputes. Flakes testified that he lied to the paramedics because it had been imparted on him that "snitches belong in ditches." Flakes and his girlfriend had been working as confidential

informants for the police. Flakes explained that by coming forward to testify, he had violated the code. Flakes also testified that his girlfriend was subpoenaed but he would not let her appear in court because he did not want her to go against the code. With respect to injuries, Flakes had numerous surgeries and was placed in a medically induced coma but doctors were eventually able to save his life.

**{¶11}** In light of the aforementioned evidence, Hickman's sufficiency argument is without merit. In order to survive a sufficiency challenge on appeal, the State is not required to present additional, corroborating evidence when it has the testimony of the eye-witness/victim. *See State v. Kyser*, 7th Dist. Mahoning No. 98 CA 144, 2000 WL 1159422, *5-6 (Aug. 10, 2000). Flakes, the victim in this case, testified that Hickman became enraged over the missing gun. Hickman then struck Flakes in the head with a brick and shot him in the leg. This evidence, when viewed in the light most favorable to the State, was sufficient to sustain Hickman's conviction for felonious assault.

**{¶12}** The third assignment of error is overruled.

**Manifest Weight of the Evidence**

**{¶13}** A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997); *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the

appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

{¶14} In support of his manifest weight challenge, Hickman contends that Flakes' testimony was not credible, as evidenced by the fact that he made several contradictory statements and could not recall certain details. Hickman further questions the reliability of Flakes' testimony given Flakes' admission that he was using crack cocaine at the time of the incident.

{¶15} Hickman correctly notes that Flakes was unable to answer certain questions posed on cross-examination, particularly with respect to the identity of the men who accompanied Hickman on the night of the incident; to whom Flakes sold the stolen gun; and the exact date that Flakes and his girlfriend moved into Hickman's house. Flakes also admitted during his testimony that he could not remember all of the details of the incident because he "was under the influence of crack." Though certain details from that evening escaped him, however, Flakes reiterated on redirect examination that, "There is no doubt in my mind that Keith Hickman shot me[.]" Hickman further attacks Flakes' credibility on the basis that the photographs admitted at trial, as well as the testimony of Det. Michael Fox, did not support Flakes' testimony regarding the physical struggle that occurred in the basement and on the first floor of the house. While Det. Fox did not find any blood, skin, or hair on or around the brick, he testified that he did not expect to find blood because "usually the first strike for castoff on an item does not produce blood on that item." Moreover, during his testimony, Flakes explained that although he was dazed and was eventually left with a scar, he was not bleeding from his head after he was struck

with the brick. With respect to the lack of any signs of struggle in the house, Flakes testified that he tried to resist Hickman throughout the incident but Hickman was a strong man who was able to overpower him.

{¶16} Hickman further contends that Flakes was the only witness who placed Hickman at the scene of the shooting. Hickman emphasizes that his next-door neighbor on Booth Ave. never observed Hickman at the scene of the shooting, nor did the neighbor hear a gunshot on the night of the incident. Though the neighbor admitted that his view was hindered by darkness, as well as several trees and bushes, he testified that there was a "commotion outside" and he cracked his window to see if he could hear anything. The neighbor heard a prolonged argument followed by someone "moaning in pain." The neighbor then heard a conversation outside the house and he noticed "cars coming back and forth as he still lay there." The neighbor eventually decided to call 911 because "[a]t some point it was just [the victim] and he was saying that he was bleeding out." While the neighbor did not hear a gun shot, the neighbor testified that the victim said he had been shot.

{¶17} After a thorough review of the record, we cannot say that this is the exceptional case where the evidence weighs heavily against conviction. During his testimony, Flakes recounted a brutal sequence of events that culminated with Hickman shooting Flakes in the leg. While Hickman has identified several discrepancies in Flakes' testimony, he has not demonstrated that the trier of fact clearly lost its way. Moreover, "[a]lthough there were discrepancies in the testimony of the witnesses 'the jury is free to believe all, part, or none of the testimony of each witness.'" *State v. Clark*, 9th Dist. Wayne No. 14AP0002, 2015-Ohio-2978, ¶ 24, quoting *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35. Furthermore, a verdict is not against the manifest weight of the evidence merely because the jury

found the State's witnesses to be credible. *State v. Andrews*, 9th Dist. Summit No. 25114, 2010-Ohio-6126, ¶ 28. Under these circumstances, where the victim emphasized that there was "no doubt" Hickman was the shooter, we cannot say that the jury clearly lost its way in convicting Hickman of felonious assault.

**{¶18}** The second assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT FAILED TO CONTROL THE WITNESS AS HE CONTINUED TO ADD COMMENTARY AND INSULT THE DEFENSE RISING TO A LEVEL OF MISCONDUCT AND PREJUDICE THAT SHOULD HAVE WARRANTED A MISTRIAL.

**{¶19}** In his fourth assignment of error, Hickman contends that the trial court committed plain error when it did not declare a mistrial in light of the victim's testimony. Hickman contends that Flakes' commentary on the record created a negative impression of Hickman, as well as defense counsel, thereby prejudicing the defendant and undermining the integrity of the trial. This Court disagrees.

**{¶20}** After Flakes identified Hickman as the shooter on direct examination, defense counsel employed several tactics on cross-examination aimed at undermining Flakes' credibility. Defense counsel asked probing questions centering on Flakes' lifestyle, drug addiction, and memory, in addition to several questions about the extent of Flakes' injuries. The exchange grew antagonistic on several occasions and the trial court repeatedly admonished both Flakes and defense counsel. At one point, the trial court sustained an objection when defense counsel asked Flakes if he was "already a crackhead" when he met Hickman. A short time later, after Flakes made unsolicited comments about how difficult it was for him confront Hickman, defense counsel asked Flakes if he used crack cocaine before he came to the courthouse. Flakes answered in the negative and took exception to the question. Later, Flakes made an uninvited

remark that he had trouble pronouncing defense counsel's name because it sounded like a disease. On another occasion, when Flakes' answer exceeded the scope of a question, defense counsel stated, "You need to shut up[.]" The trial court directed both defense counsel and Flakes to be quiet, but not before Flakes responded, "You don't tell a grown man to shut up." The trial court then threatened to hold both the witness and the attorney in contempt. Subsequently, when the trial court sustained an objection to a question on re-cross examination, Flakes remarked, "This is ridiculous. They['re] giving law licenses out." The trial court rebuked Flakes, and he apologized. Shortly thereafter, when the trial court sustained yet another objection to a question by defense counsel, Flakes exclaimed, "So you didn't smoke crack this morning?" The trial court directed the jury to disregard the comment, and defense counsel then indicated he had no further questions. After dismissing the jury for a lunchtime recess, the trial court held Flakes in contempt for the question he directed toward defense counsel.

{¶21} There are no exact standards to apply in evaluating whether a trial court should declare a mistrial in a particular case. *State v. Plant*, 9th Dist. Wayne No. 2599, 1991 WL 81650 (May 15, 1991). "Instead, the law grants great deference to the trial court's discretion in this area, in recognition of the fact that the trial judge is in the best position to determine whether the situation in his courtroom warrants the declaration of a mistrial." *Id*. "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991); *State v. Mercer*, 9th Dist. Summit No. 26361, 2013-Ohio-1527, ¶ 7.

{¶22} Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To constitute plain error, the error must be obvious and have a substantial adverse impact on both the integrity of,

and the public's confidence in, the judicial proceedings. *State v. Tichon*, 102 Ohio App.3d 758, 767 (9th Dist.1995). A reviewing court must take notice of plain error only with the utmost caution, and only then to prevent a manifest miscarriage of justice. *State v. Bray*, 9th Dist. Lorain No. 03CA008241, 2004-Ohio-1067, ¶ 12. This Court may not reverse the judgment of the trial court on the basis of plain error, unless appellant has established that the outcome of the trial clearly would have been different but for the alleged error. *State v. Kobelka*, 9th Dist. Lorain No. 01CA007808, 2001 WL 1379440 (Nov. 7, 2001), *2, citing *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996).

{¶23} In this case, the trial court did not commit plain error by failing to sua sponte declare a mistrial. Flakes was the State's key witness in this case and defense counsel pursued an aggressive line of questioning in hopes of attacking Flakes' credibility. The fact that Flakes struggled to answer certain questions and became exceedingly emotive during his testimony was not prejudicial to Hickman, and, in fact, seemed to suggest that defense counsel succeeded in calling into question the reliability of the State's most important witness. Furthermore, though Flakes made a number of unbridled comments during his testimony, the trial court consistently intervened and directed Flakes to wait for a question and to refrain from making argumentative statements. Thus, Hickman has not "established that the outcome of trial cleansed of the objectionable statement[s] would have been different or that the trial court's failure to order a mistrial was a manifest miscarriage of justice." *State v. Jones*, 9th Dist. Summit No. 18690, 1998 WL 318483, *1 (June 17, 1998). Accordingly, the fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR V

> THE PROSECUTOR'S REMARKS ABOUT THE APPELLANT ROSE TO
> THE LEVEL OF PROSECUTORIAL MISCONDUCT, WHICH DEPRIVED
> THE APPELLANT OF HIS RIGHT TO A FAIR TRIAL IN VIOLATION OF
> HIS 5TH, 6TH, AND 14TH AMENDMENT RIGHTS UNDER THE U.S.

CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

**{¶24}** In his fifth assignment of error, Hickman contends that the trial court should have granted a mistrial because the prosecutor made improper comments that rose to the level of prosecutorial misconduct. Specifically, Hickman contends that the prosecutor's statements about Hickman being a drug dealer were an improper and prejudicial expression of personal opinion. This Court disagrees.

**{¶25}** We note at the outset that Hickman stresses in his merit brief that the prosecutor first referred to Hickman as a drug dealer during opening statements. The transcript reveals that when defense counsel objected during opening statements, the trial court sustained the objection and directed the prosecutor to refrain from "editorializing."

**{¶26}** The crux of Hickman's assignment of error deals with the trial court's denial of his motion for mistrial made at end of the State's closing argument. During closing arguments, the prosecutor referred to Hickman as a drug dealer on multiple occasions. On one occasion, the prosecutor stated that Hickman would "deal drugs" to Flakes. On several other occasions, Flakes stated that Hickman supplied Flakes with drugs and that Hickman lived his life in accordance with "the G code." When the State concluded its closing argument, defense counsel moved for a mistrial "based on the improper comments made by the prosecutor during his close." Defense counsel argued that the "drug dealer" references constituted an improper expression of personal belief and opinion by the prosecutor. In denying the motion, the trial court reminded defense counsel that the parties had agreed that the State could introduce evidence that Hickman was a drug dealer. The trial court stated, "[S]o your decision was that you wanted to make the argument that [Flakes] was a drug user and that therefore I was going to allow the questioning

based on personal observation[] only that [Hickman], in fact, might have been engaging in drug dealing." When asked if he remembered the discussion, defense counsel stated, "Yes, we did."

{¶27} This Court reviews a trial court's denial of a motion for mistrial for an abuse of discretion. *See State v. Halsell*, 9th Dist. Summit No. 24464, 2009-Ohio-4166, ¶ 6. The prosecution is normally entitled to a certain amount of latitude during closing argument. *State v. Smith*, 14 Ohio St.3d 13 (1984). "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *Smith*, 14 Ohio St.3d at 14. "If the prosecutor's comments were improper, 'it must be clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found the defendant guilty.'" *State v. Jones*, 9th Dist. Summit No. 24776, 2010-Ohio-351, ¶ 19, quoting *Smith*, 14 Ohio St.3d at 15.

{¶28} The prosecutor's comments did not warrant a mistrial. Defense counsel acknowledged on the record that the parties reached an agreement whereby the State could introduce evidence that Hickman was engaged in drug dealing. During closing argument, "[t]he prosecutor may draw reasonable inferences from the evidence presented at trial, and may comment on those inferences during closing argument." *State v. Treesh*, 90 Ohio St.3d 460, 466 (2001), citing *State v. Smith*, 80 Ohio St.3d 89, 111 (1997). Here, Flakes testified that Hickman was a drug dealer and that Flakes received drugs in exchange for the work he did for Hickman. Flakes further testified that Hickman had taught him that, pursuant to "the G code," drug dealers settle disputes on their own without the involvement of law enforcement. In light of the parties' agreement, as well as the testimony linking Hickman to drug dealing, it was not improper for the prosecutor to comment on that evidence during closing argument. It follows that the trial court

did not abuse its discretion by failing to declare a mistrial. The fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR VIII

THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT FAILED TO PROVIDE CURATIVE STATEMENTS TO THE JURY TO COMBAT THE PREJUDICIAL EFFECTS OF A WITNESS AND TH[E] PROSECUTION, WHICH DEPRIVED THE APPELLANT OF A FAIR TRIAL.

{¶29} In his eighth assignment of error, Hickman contends that the trial court committed plain error by failing to give a curative instruction to the jury to mitigate the comments made by the prosecutor and Flakes. Though Hickman does not identify specific comments in support of this assignment of error, he argues that a curative instruction was warranted because the behavior exhibited by the prosecutor and Flakes throughout trial tipped the balance of credibility toward the State. As noted above, the trial court was attentive and active in monitoring the prosecutor, defense counsel, and Flakes in order to ensure the trial unfolded fairly and without undue prejudice. Moreover, in light of the fact that Hickman has forfeited all but plain error, and given our resolution of the aforementioned assignments of error, we cannot say that the trial court's failure to sua sponte give a curative instruction was such an obvious error that it undermined the integrity of the judicial proceeding and resulted in a manifest miscarriage of justice. *See Tichon*, 102 Ohio App.3d at 767. The eighth assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED THE APPELL[A]NT'S MOTION FOR A MISTRIAL BASED ON THE FACT THAT JUROR MISCONDUCT OCCURRED, WHICH ADVERSELY AFFECTED THE APPELLANT'S RIGHT TO A FAIR TRIAL IN VIOLATION OF HIS 5TH, 6TH, AND 14TH AMENDMENT RIGHTS UNDER THE U.S. CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

{¶30} In his first assignment of error, Hickman argues that the trial court abused its discretion when it denied appellant's motion for a mistrial based on the actions of a juror. Hickman asserts that the jury was contaminated when Juror No. 2 performed outside research and shared his findings with the jury. This Court disagrees.

{¶31} A trial court enjoys broad discretion in dealing with matters of juror misconduct. *State v. Morris*, 9th Dist. Summit No. 25519, 2011-Ohio-6594, ¶ 29, citing *State v. Herring*, 94 Ohio St.3d 246, 259 (2002). Thus, an appellate court reviews the trial court's denial of a motion for mistrial based on juror misconduct for an abuse of discretion. *State v. Thomas*, 9th Dist. Summit No. 26893, 2014-Ohio-2920, ¶ 32, citing *Morris* at ¶ 29. Under this standard, "[a] trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by evidence, or grossly unsound." *Menke v. Menke,* 9th Dist. Summit No. 27330, 2015-Ohio-2507, ¶ 8, quoting *Tretola v. Tretola*, 3d Dist. Logan No. 8-14-14, 2015-Ohio-1999, ¶ 25.

{¶32} "When analyzing a case of alleged juror misconduct, it must be determined (1) whether misconduct actually occurred and (2) whether the misconduct materially prejudiced the defendant's substantial rights." *Morris* at ¶ 28, citing *State v. Herb*, 167 Ohio App.3d 333, 2006-Ohio-2412, ¶ 6 (9th Dist.). Thus, even when juror misconduct has, in fact, occurred, a complaining party must establish prejudice. *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, ¶ 42, citing *Smith v. Phillips*, 455 U.S. 209, 217 (1982). The Supreme Court of Ohio has maintained a "long-standing rule * * * not [to] reverse a judgment because of the misconduct of a juror unless prejudice * * * is shown." *Adams* at ¶ 45, quoting *State v. Hipkins*, 69 Ohio St.2d 80, 83 (1982); *Thomas* at ¶ 33.

{¶33} Furthermore, "[a] juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court." *Thomas* at ¶ 34, quoting *State v. Schmitz*, 9th Dist. Lorain Nos. 11CA010043, 11CA010044, 2012-Ohio-2979, ¶ 15. "One may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest [person] to live up to the sanctity of his [or her] oath is well qualified to say whether he [or she] has an unbiased mind in a certain matter." *State v. Gunnell*, 132 Ohio St.3d 442, 2012-Ohio-3236, ¶ 30, quoting *Phillips*, 455 U.S. at 217, fn. 7. While a trial court's determination with respect to juror bias is entitled to great deference under circumstances where a juror reads outside or forbidden material, we note that the trial court's inquiry of the juror is vital in making its determination. *Gunnell* at ¶ 32-34.

{¶34} Just after the parties signed the verdict forms in this case, Juror No. 2 wrote the trial court a note stating, "Juror No. 2, [] looked up names on the Summit County Clerk of courts website for name spelling purposes. Looked up name of defendant. Thought it was Whitman."

{¶35} Upon receiving the note, the trial court decided to question the juror in chambers in the presence of counsel. The trial court asked Juror No. 2 to explain the note. Juror No. 2 responded, "Curiosity. The name for some reason escaped me. It was like was it Hickman, Whitman, and I just felt like I should just know the name. And I thought if I just put that in, Whitman, on the Summit County Clerk of Courts, not on Google, just to see what the name was between the two." The website search occurred during the early stages of the trial, after the jury had been impaneled. When questioned about the scope of his inquiry, Juror No. 2 stated, "I typed in Whitman, and Whitman came up with not what I thought it was. And then Hickman. And then just next to it, it just said the charge, and that's all the further I went with it. * * * I didn't click on it or anything like that." When asked why he felt compelled to write the note,

Juror No. 2 explained that he mentioned his search to his fellow jurors after they reached a verdict and signed the paperwork. At that point, the foreman then urged Juror No. 2 to notify the court. In addition to stating that the information on the clerk's website did not impact his decision, Juror No. 2 insisted that he did not share any information with the jurors that was not presented in court.

{¶36} After questioning Juror No. 2, the trial court stated on the record that it did not appear that his search was prejudicial. Defense counsel asked to have Juror No. 2 replaced with the alternate juror or, in the alternative, to pursue additional questioning to ensure that he was telling the truth. At that point, the trial court agreed to question the jury foreman. The foreman stated that Juror No. 2 did not mention the website search until after the jury had reached a verdict. The foreman further stated that Juror No 2 did not make any substantive comments about the case, other than to note that Flakes' girlfriend had been subpoenaed to testify. In response to a question from the prosecutor, the foreman stated that he was not aware that Juror No. 2's website search played any role in the verdict itself.

{¶37} The trial court indicated that it wanted to question Juror No. 2 again regarding the statement about the subpoena for Flakes' girlfriend. Both attorneys agreed that further questioning was warranted. The trial court again brought Juror No 2 into chambers and asked him whether he made a comment about the subpoena. Juror No. 2 said he expressed an opinion about the subpoena but his opinion was not based on any information from outside of court. On two separate occasions, the trial court asked if he clicked on the case link on the clerk's website, and Juror No. 2 responded in the negative on both occasions. At that point, the trial court excused Juror No 2. and called the foreman back into chambers. The trial court asked the foreman whether Juror No. 2's statements regarding the subpoena were based on online research

or evidence that was provided to the court. The foreman initially responded that Juror No. 2 said he was "online and he found stuff." When pressed on the issue, the foreman said he was not certain because he was using the restroom at the time and walked into the room in the middle of the conversation. The trial court continued to probe into the issue. The foreman stated, "[Juror No. 2] said he was looking up stuff on the website and he saw Mr. Hickman's name. I believe he said he saw a subpoena for [Flakes' girlfriend]. It was easy to find. And that's all he said. He didn't discuss any of the contents * * *[.]"

{¶38} At that point, defense counsel moved for a mistrial. Before ruling on the motion, the trial court voir dired each juror to determine the impact of any statements made by Juror No. 2. The jurors were uniform in saying that any statements made by Juror No. 2 did not influence deliberations. There was some disagreement about when the statements were made with two jurors saying the statements were made before deliberations concluded and another juror saying he could not recall the statements at all. Significantly, however, all of the jurors insisted that any outside research performed by Juror No. 2 did not impact their decision in the case. After speaking with each juror, the trial court denied the motion for a mistrial.

{¶39} The trial court did not abuse its discretion in denying Hickman's motion for a mistrial. "The trial judge is in the best position to determine the nature of the alleged jury misconduct and the appropriate remedies for a demonstrated misconduct." *State v. Wharton*, 9th Dist. Summit No. 23300, 2007-Ohio-1817, ¶ 25. The trial court in this case sought to safeguard the fairness of the trial by engaging in a deliberate inquiry to determine the extent of the misconduct and the effect that it may have had on the jury. In addition to questioning Juror No. 2 and the jury foreman on multiple occasions, the trial court engaged in an independent examination of each juror. Though Hickman asserts there is "no way to know for certain"

whether Juror No. 2's statements influenced deliberations, we note that Hickman was required to establish that he was prejudiced by the misconduct. *Adams* at ¶ 45. Here, each juror, including Juror No. 2, was adamant that the website search had no impact on their decision in the case. Under these circumstances, we cannot say that the trial court's denial of the motion was unreasonable, lacking in evidentiary support, or grossly unsound.

**{¶40}** This first assignment of error is overruled.

## ASSIGNMENT OF ERROR VII

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO REPLACE THE JUROR WHO PERFORMED OUTSIDE RESEARCH WITH THE ALTERNATE JUROR TO ENSURE A FAIR TRIAL FOR APPELLANT.

**{¶41}** In his seventh assignment of error, Hickman contends that the trial court abused its discretion by failing to replace the juror who performed outside research. This Court disagrees.

**{¶42}** We reiterate that "[a] reviewing court affords a trial court considerable deference with respect to its handling of alleged juror misconduct." *Akron v. McGuire*, 9th Dist. Summit No. 24638, 2009-Ohio-4661, ¶ 5. After Juror No. 2 was questioned by the trial court, defense counsel made alternative requests. Specifically, defense counsel stated, "I would * * * ask that [Juror No. 2] be removed and have the alternate placed on the jury and have them deliberate. Or in the alternative, let's confirm what [Juror No. 2] had to say as to whether or not this conversation took place, not that I have any reason to doubt that he's going to come in here and lie, but I think we would have an obligation to at least check just to verify." While Hickman asserts that the trial court denied his request, the record indicates that the trial court agreed to undertake the latter measure. After interviewing the jury foreman and then interviewing Juror No. 2 a second time, the trial court further explored the alleged misconduct issue by questioning

every member of the jury in the presence of counsel. Each juror indicated that the outside research did not influence their decision. *See State v. Stallings*, 89 Ohio St.3d 280, 297 (2000), quoting *Phillips*, 74 Ohio St.3d at 89 ("A juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court."). Thus, even assuming that the trial court implicitly denied Hickman's request to replace the juror in question, his argument is without merit given that he has failed to demonstrate prejudice. *See Stallings*, 89 Ohio St.3d at 297 ("the complaining party must show actual prejudice.").

**{¶43}** The seventh assignment of error is overruled.

## ASSIGNMENT OF ERROR VI

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN IMPOSING APPELLANT'S SENTENCE.

**{¶44}** In his sixth assignment of error, Hickman contends that the trial court abused its discretion when it imposed his sentence. Hickman does not argue that his sentence falls outside the acceptable range set forth in the Revised Code. Rather, Hickman asserts that the trial court abused its discretion by failing to give adequate consideration to the sentencing factors set forth R.C. 2929.11 and R.C. 2929.12, particularly with respect to the likelihood of recidivism, prior to imposing a maximum sentence. This Court disagrees.

**{¶45}** This Court utilizes the test set forth in *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, when reviewing criminal sentences. *See State v. Thomas*, 9th Dist. Medina No. 14CA0042-M, 2015-Ohio-2195, ¶ 9.

> First, [we] must examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law. If this first prong is satisfied, the trial court's decision in imposing the term of imprisonment is reviewed under the abuse-of-discretion standard.

*Kalish* at ¶ 26.

{**¶46**} The Supreme Court of Ohio has held that "[t]rial courts have full discretion to impose a prison sentence within the [applicable] statutory range[.]" *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, paragraph seven of the syllabus. In exercising that discretion, "'[a] court must carefully consider the statutes that apply to every felony case[,] * * * includ[ing] R.C. 2929.11, which specifies the purposes of sentencing, and R.C. 2929.12, which provides guidance in considering factors relating to the seriousness of the offense and recidivism of the offender.'" *State v. Davison*, 9th Dist. Lorain No. 10CA009803, 2011-Ohio-1528, ¶ 12, quoting *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, ¶ 38. "[W]here the trial court does not put on the record its consideration of [R.C.] 2929.11 and R.C. 2929.12, it is presumed that the trial court gave proper consideration to those statutes." *State v. Thrasher*, 9th Dist. Summit No. 27547, 2015-Ohio-2504, ¶ 4, citing *State v. Steidl*, 9th Dist. Medina No. 10CA0025-M, 2011-Ohio-2320, ¶ 13, quoting *Kalish* at ¶ 18, fn. 4. "Unless the record shows that the court failed to consider the factors, or that the sentence is strikingly inconsistent with the factors, the court is presumed to have considered the statutory factors if the sentence is within the statutory range." (Internal quotations and citations omitted.) *Thrasher* at ¶ 4, quoting *State v. Fernandez*, 9th Dist. Medina No. 13CA0054-M, 2014-Ohio-3651, ¶ 8.

{**¶47**} In the April 2, 2014 sentencing entry, the trial court explicitly stated that it considered "the record, oral statements, as well as the principles and purposes of sentencing under []R.C. 2929.11, and the seriousness and recidivism factors under []R.C. 2929.12." Both parties offered arguments with respect to the statutory factors at the sentencing hearing. In response, the trial court underscored the egregious nature of the facts in this case and likened Hickman's conduct to the worst form of the offense, stating, "the Court does find this to be one of the most serious forms of this offense that I have heard, [the] felonious assault charge. * * *

[I]t's clear that Mr. Flakes almost died. The paramedic testified that she wasn't even sure he was going to make it to the hospital." With respect to R.C. 2929.12, the trial court stated, "I do not believe that a minimal sentence would adequately address the level of seriousness, nor would it properly protect the public." Given the nature of the evidence in this case, as well as the trial court's emphasis on the excessively violent nature of Hickman's conduct, we cannot say that Hickman's sentence was strikingly inconsistent with the sentencing factors. *Thrasher* at ¶ 4, citing *Fernandez*, 2014-Ohio-3651, at ¶ 8.

{**¶48**} The sixth assignment of error is overruled.

### ASSIGNMENT OF ERROR IX

THE CUMULATIVE EFFECT OF ALL THE ERRORS ENUMERATED IN ASSIGNMENTS OF ERROR[] 1, 4, 5, 7 AND 8 DENIED THE APPELLANT THE RIGHT TO A FAIR TRIAL AND DUE PROCESS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, R.C. 2901.04, AND ARTICLE 1 SECTION 10 OF THE OHIO CONSTITUTION.

{**¶49**} In his final assignment of error, Hickman contends that the errors established in his first, fourth, fifth, and seventh assignments of error had a cumulative effect which undermined his right to a fair trial. This Court disagrees.

{**¶50**} Under the cumulative error doctrine, a conviction may be reversed when the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial even though none of the errors, in isolation was prejudicial. *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. In the absence of multiple errors, the cumulative error doctrine does not apply. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 132. In this case, Hickman has not identified errors in the trial court proceedings, so it cannot be said that cumulative errors deprived him of a fair trial. *See State v. Chapman*, 9th Dist. Summit No. 26175, 2013-Ohio-357, ¶ 49; *State v. Taylor*, 9th Dist. No. 09CA009570, 2010-Ohio-962, ¶ 40.

**{¶51}** The ninth assignment of error is overruled.

### III.

**{¶52}** Hickman's nine assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

WHITMORE, J.
SCHAFER, J.
CONCUR.

APPEARANCES:

JASON D. WALLACE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.